Good morning, your honors. My name is Lynn Conkling, and I am attorney for Appellants Robert and Isla Destfino. In the record before you, you have the factual and legal basis to overturn the lower court's decision and find that their findings were clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed, as articulated in this court by Banks v. Gill Distribution Centers. In this case, a grave mistake has been committed. The prior court's decisions require my clients to repay Mr. Bockting every penny that he lost in the illegal corporate soul scam. This is clearly a mistake because the scam was illegal. My client, Isla Destfino, invested Mr. Bockting's money pursuant to his expressed intentions. Ms. Destfino accounted for the majority of Mr. Bockting's funds. In addition, Mr. Bockting has unclean hands, as is represented in the briefs and I will briefly describe. Counsel, what's your understanding of the bankruptcy court's oral findings about your client and about the nature of the accounting that you presented? My understanding of – I'm sorry, what was the question? Yeah, I want to know what – I've read the transcript of the district court's findings. I mean, I'm sorry, the bankruptcy court's oral order. Okay. We don't have a written order, right? We finally have a very short one, but all of the essential findings are made in an oral – at an oral hearing. Correct. Is that correct? Correct. Okay. And he says, look, it might be fraud. I'm not going to find fraud, but I do find defalcation. And you've offered a series of accountings. And what is your understanding or reading of what the bankruptcy court said about the accountings you presented? My understanding is the bankruptcy court concluded that those accountings were inconsistent and therefore they were not credible. Well, they were inconsistent. You came to different numbers. You had a series of different accountings. You came to different numbers. But the numbers are all, in the scheme of things here, fairly large. That is, most of them came to something over $300,000 that you thought you'd spend on – that you thought the Deskinos had spent on cars, insurance, and houses. Correct. So there is some inconsistencies in that you didn't come up with the same numbers every time you did the accounting. Correct. Okay. So what's the problem? What's the problem here? So the problem is, at trial, Ms. Deskino was questioned on her accounting, Exhibit HH. And that exhibit was presented as the final accounting of all the transactions. It was linked to, in exhibits, to bank statements as well as checks, canceled checks. Did she present the underlying evidence, the evidence of the visa accounts or the canceled checks, the fees? Yes, she did. And, as a matter of fact, Mr. Bochting had that information a year and a half before trial because he subpoenaed all of her bank records. But, in fact, we also included in the exhibits at trial copies of the bank statements and copies of canceled checks. Did you go to any independent accounting firm or anybody else to try and match all of these things up? Actually, Your Honor, we did. And my client has actually paid for an audit that was presented to the district court in the motion to stay. And the district court totally ignored that information. Why was it prepared so late? Because everything else would have been her presenting and saying, here's the receipt to show that I paid the insurance on this car. Exactly. And that's a great question. The reason is, when we went to trial, I advised my client to, because she doesn't have an accounting background but she's a business owner, I said, go ahead and put on a spreadsheet, this is all the income, this is the money you received from your uncle. Include the check number, the account that it came from, and a copy of the document supporting that, whether it was a bank statement or what have you. And I also advised her to, on the same spreadsheet, which is actually exhibit HH at trial and exhibit 18 in the appellant's exhibits, I advised her to also detail every single transaction, every disbursement out of the six accounts she was managing that was related to her uncle's corporate sole venture. And I asked her further in that accounting to delineate the check number, the payee, the date, the account that it came from, and a description. Up until then, she had not done that, and her accounting was confusing. My assumption was, because Mr. Bochting had all the underlying bank statements and canceled checks, that it would be pretty easy to just look at the exhibit and the list of transactions, which again is in the records submitted, and be able to verify with the trial exhibits that these funds were actually disbursed. And a great example of this is the hundreds of thousands of dollars that were spent for Mr. Bochting's mortgage. So his properties were refinanced. He signed the loan papers. He signed the grant deeds. He signed the loan origination documents. Those funds, 200 and something thousand, ended up going to the accounts that Ms. Desfino managed. She used those funds over a two-year period, yes, to pay the auto loan, but she also used those funds to pay the mortgage for the two homes that Mr. Bochting was living in. And when my client commissioned an audit after we lost the first appeal, I actually asked Mr. Bochting if he would sign authorization so that I could get the records from the lender to verify that the lender received the payment, payments, even though Mr. Bochting already had copies that were canceled checks and statements. Mr. Bochting refused to do that. Because the loans were in his name, he was in the most likely position to get that evidence, and he wouldn't agree to that. Let me ask you the practical matter. I feel like we can't really be an audit committee up here on the Ninth Circuit. Understandable. And we've got these four accountings. They're inconsistent. Then we have the final accounting. And we have some explanations, like you've just given, that, in fact, even though it looked like the money was spent, it was spent as part of this overall structure of the transaction. Two questions, then. Under what standard do we evaluate the district court's determination on these accountings? And if we were to determine that we think that the kind of broad-brush stroke of how the final number was arrived at in the district court was wrong, what do you think the course of action should be? If you held that the district court standard was wrong? Well, what standard do we look at the district court? That's a great question. And I actually researched, you know, Ninth Circuit has dealt with devaluation issues. And I was trying to find a standard. I mean, is it finding a fact? Is it clear error? Is it abuse of discretion? I think it's clear error because accounting is such an exact science. If you can take a transaction and you have date, time, amount, and you can trace that transaction where the funds came from and where they ultimately ended up, that's ‑‑ I don't think it's an abuse of discretion. I think it's a higher standard, which is clear error. And I think if you look at the Exhibit HH, which was presented at trial, and just to clarify, there really were not four different accountings. Two of the accountings, one Exhibit DD at trial, another accounting was the Plaintiff's Trial Brief. And I actually made a $200 error in there. So those two accountings actually were the same. I interjected an error. The first accounting was two years prior to trial, Spirit Heart Accounting, two years prior to trial. And when I took this case, I looked at it and I said, Isla, this doesn't make any sense. Let's put something together that makes sense. And during my client's depositions in November, the year before trial, I offered an accounting. I had my client generate an accounting, and that was Exhibit DD. And, again, because Mr. Bochting had all the supporting statements, he was the one that could determine that the loans had been paid because they were in his name. I didn't see the need for an audit. Obviously, after losing a trial, even though the district court disregarded the audit, my client knows the facts. And we actually had a mediation set up with the Ninth Circuit to present this to Mr. Bochting, because I don't believe he'd seen this information and the mediation was refused. Ginsburg. Well, okay. So you haven't quite answered my question. If we found, if we see that there were some discrepancies in how the district court went about this, you know, options could be that if we found that, you know, we could sort through all of this, but then that turns us into a district court. We could send it to mediation. We could send it back. I'm asking you, what are you asking the court? You're the appellant. Two things. One is to dismiss the case because the whole contract was based on an illegal contract. Okay. And assuming you're not going to do that. I assume for the moment that we think there's some kind of trust relationship under the partnership, that we're not going to dismiss the case, that those are really good arguments, but let's just say we disagree with you for the moment. As much as I hate to admit this, I think the, I think what should be done is it gets remanded back to district court to determine, or mediation, because my client would welcome the opportunity to sit down with her uncle in the same room and go over these numbers. Does it get remanded to the district court, and then does the district court have discretion to send it back to the bankruptcy court? That's a good question. Somebody's going to have to sit down, and if we were to agree with you, somebody's going to have to sit down and go through all of these receipts and say, okay, this one matches up. I see what we have here. Somebody's going to have to do that accounting that we finally did before the district court that the district court didn't look at. Another option may be to submit the audit to Mr. Bochting, again, some form of mediation or something. But there's a lot of ways to resolve this. There are lots of ways. We can't. That's not a result we can impose. So there are lots of ways to resolve it. Focus just on the legal proposition. What order do you think should come from us, not to preclude the parties from figuring out on their own which is what they should do, but what order are you seeking from us? To hold my clients liable at this point, given the constraints, for the $22,000 that is identified in the brief as unaccounted for. The number is ---- Do we have a number so definite that you think that we can simply say this is the result, or are there sufficient uncertainties that we should remand someplace for the other uncertainties to be ironed out to reach a final number? If Mr. Bochting were to agree to this final number of 20-something thousand, then this could go away. If he agreed to that, I hope that you guys wouldn't come all the way over here from Montana to talk with us. There is ---- there is some uncertainty. Does ---- did my client account for $356,000 or $366,000? So there's uncertainty which suggests there's not a definite number we should order. It should be ---- with all the premise about we're in this ---- that should be remanded, where would it be remanded? I would ---- And do we even have authority? If we thought it should be in the bankruptcy court, do we have authority to send it straight to the bankruptcy court and bypass the district court, or do we have to send it back to the district court? No, I believe you have to send it to district court. With the suggestion that if the district court wants to send it back, to pass it on to the bankruptcy court. Yes. And I guess that is the logical ---- Okay.  So I would prefer ---- yes, that's what I'm requesting, is that you send it back to district court. Not to preclude the parties from settling on a number themselves. I understand. But for something ----    for me to assume it, to assume the severance capital that I wasottle did not relevant for what the complaint was unaccounted for. Do you want to save the remaining time for rebuttal? Yes, I would. Thank you. Good morning, Your Honors. My name is Scott Coban, and I represent the appellee, Gerald Bockting. May it please the Court, this is an interesting case. The trial court, David Russell, found the Gosfinos liable for fraud or for defalcation and embezzlement. In their briefs in the trial, they admit they received $475,000 of Mr. Bockting's money. They admit they took $268,000 from a joint account without his permission. They admit they squandered $150,000 on luxury automobiles. Well, stop there, because I don't think they admit squandered. I think they admit they spent the money in a way which they think was perfectly consistent with the arrangement that was entered into with your client. That's their argument, Your Honor. Well, what's wrong with the argument? It makes sense to me. Your Honor, I don't think a prudent investment is buying eight luxury automobiles, buying a baby grandchild. Your client had at least one of them? He had one of them possessed in his garage for a while. And he knew the others were being bought as part of this plan? It may not be a wise investment, but I don't know that it was outside the purview of the agreement that he reached. No, Your Honor. He was present for the purchase of the first automobile, and he was not aware of the purchase of the other automobile. But he knew that the whole scheme that Kennedy was advocating required that they buy cars and deal in his real estate. He knew that. Well, Your Honor, he went to one meeting. He met Mr. Kennedy on one occasion. And I think what we can see from the evidence is that this was an investment the Destinos were possibly thinking about doing. But once they got their hands on $475,000, Mr. Bockting's money, they were not going to share that with Mr. Kennedy. Well, the whole thing was pretty half-baked, obviously, in terms of, you know, tax avoidance and the way that they were going about it. But if all of this was part of the scheme that they had the money, they had the authority to do this, did they not? I disagree, Your Honor. Okay. They went to one – Mr. Bockting went to one meeting with Mr. Kennedy. The Bocktings convinced him to invest in this one transaction, which involved $21,000. What do you think was being done with the rest of the money? I don't think he really understood, Your Honor. Wait, wait, wait, wait, wait, wait, wait, wait. He didn't understand? He knew the money had been given over. Did he think they were keeping it in a safe deposit box someplace? Well, Judge Russell, who had the opportunity to view the witnesses at trial, and I wish you could have been there to see the testimony, my client's about 80 years old. He's a widower. A lonely man moved into a different city. He trusted his niece. It was obviously foolish. But you don't have any findings from the bankruptcy court that will back up your claim  The bankruptcy court said he didn't find fraud. And what he takes them out on is the accounting. It's the money to account for. He hasn't found that they defrauded him or that they stole money from him or anything else. So the claims that you're making here, you don't have a bankruptcy decision or a district court decision to back up. Actually, I do, Your Honor. If you look at the findings on starting on page 34, Judge Russell primarily uses the word accounting, and I certainly wish he had the opportunity to prepare a written statement. But he repeatedly talks about that they saw an opportunity and they used it for their benefit. To be specific. Well, they've commingled some funds here. I mean, this has been some pretty sloppy practices on their part. I don't think there's any question about that. On page 35, he emphasizes defalcation includes the innocent, innocent, mind you, defalcation of a fiduciary. And you're selling us on a fraud case, which I don't think is what the bankruptcy court found. Well, Your Honor, I'm claiming a misrepresentation. I think it's beyond just a fraud. Well, but you're trying to defend the order that's already been entered. You're not going to come in and succeed with a new theory. Where in the order that was entered in the findings of fact is there's this fraud claim that you're trying to sell us? Well, I'm not trying to sell you fraud. I'm referring to page 34, line 21 and 22. Well, defalcation is defined as the misappropriation, trust funds, or money held in a fiduciary capacity. And on the next page, he says what I read, page 35 starting at line 10, defalcation includes the innocent, innocent, mind you, defalcation of a fiduciary. So where does he find fraud? Where does he find misrepresentation? He doesn't find fraud. He finds misappropriation. He uses the word a number of times. Right. But that's not misrepresentation. I mean, basically, it's all a question of what the money was spent for and whether it can be accounted, correct? Yes. So now if we take counsel's proposition, which is, you know, these are factual findings for clear error, and if we find that, if we determine that there is clear error here, in your view, what is the remedy for that? Well, if you were to find clear error, which I obviously disagree with, that should be sent back to the district court, which would, I would presumably refer the matter to David Russell to resolve. But, and to be clear, I'm not claiming fraud. What I'm claiming is they misappropriated his money and used it to their benefit. And Judge Russell and his findings. How is that not fraud? I mean, what's the cause of action? I disagree with David Russell. I believe he should have found fraud, but he didn't. But he didn't. And so what we have in front of us, what is the justification for the award that was entered by the bankruptcy court and sustained by the district court? I believe his use of the word misappropriation, they took his money and they used it for his benefit. Well, for his benefit? I'm sorry. I'm sorry. For their benefit. See, but if he refused to say it was – if he emphasized it was innocent, that suggests something other than that. That suggests that they were doing it as part of the program. And the way I understood reading all this is that, well, both parties were in this program. It was a dumb program, but they're in the program, and your client may have understood it even less, but it's not that suddenly he put in this money and the defendants were going off using it for themselves to enrich themselves. He's emphasizing it was innocent. It seems to me the hang-up the bankruptcy court had was with the inconsistent accounting. If you're going to sell us a case based on inconsistent accounting, I want to give you the chance to do that, but the notion that he found that they swiped his money, I just don't see in the findings that he made. Well, I disagree. He makes the word innocent, saying that defalcation can include an innocent misrepresentation – an innocent use of money. But he never found that their behavior is innocent, and he repeatedly uses the word misappropriation. In my view, what they did of basically, in my opinion, squandering their money on luxury automobiles, even if they can account for the money there – But the bankruptcy court's – I mean, the bankruptcy court's order just leaves quite a bit to be desired here. The bankruptcy court never makes those kinds of findings. It criticizes the accounting. It talks about being sloppy. It talks about commingling funds. But the bankruptcy court does not say these people put this money to purposes for which Mr. Kennedy – that Mr. – I'm sorry, Mr. Bokting had no intention. The fact of the matter is that Bokting knew from the outset that they were dealing with Kennedy, that they had a scheme to avoid paying taxes, and it involved the purchase of luxury cars, mortgaging property, refinancing things, and putting it into some kind of religious corporation in a scheme that makes absolutely no sense whatsoever. But Bokting seemed to have understood that, and that seems to have been what they did in part. I disagree, Your Honor. Mr. Bokting went to one meeting with Mr. Kennedy. There was one agreement. Mr. Copeland, you haven't got the findings, though. You understand this is a very powerful theory that you have. It wasn't a winning theory before the bankruptcy court. And so I have Judge Clifton's problem. You're defending something the bankruptcy court didn't do. And you may wish to defend what the bankruptcy court did do, or you may find yourself back with the bankruptcy court. Well, there are four or five accountings, depending on how you count them up. They're inconsistent. I think an accurate – But they're inconsistent. They're not inconsistent in an order of magnitude. You know, there's – we're talking about – we're talking about accountings in which they came up with at least $300,000 or more every time they did this. And the differences are going to be maybe $20,000, but it's not – it's not $100,000. I understand. $388,000. Yeah. More precisely what the bankruptcy court did. I agree that they disclosed what they spent a lot of the money on. There's no doubt they did. The problem is I don't think disclosing that I took your life savings without your permission and bought a lot of savings. No, stop right there. Because he gave his life savings to them. So you can't tell me they took it without permission. He gave it to them. Now, he may have understood they were going to use it in a certain fashion, but I don't see anything in the bankruptcy court that said they used it different from the plan. Well, actually, Your Honor, he deposited – a total of $268,000 was removed from a joint account without Mr. Bockting's permission.  They took the money without his permission. Right. But if it's a – and did the joint account require permission from him? No. It's a joint checking account. Right. It's a joint account. So they didn't have to have his permission if it's a joint account. Your Honor, I have a joint account with my mother. I could take her money if I wanted to as well. That doesn't make it correct. I wouldn't do that without his permission. That's a moral issue, not a legal issue. It's a different proposition. The bank isn't surprised to learn that they took the money out. He didn't give them permission to spend $268,000 of his money without his permission. I mean, that is something they admit to in the record. Then why did he put the money in the account in the first place? Because they promised to use it for his benefit and they would consult with him. Well, and isn't that what – I mean, if you get around the fact that it's a dumbass scheme, didn't they, in fact, use it on the dumbass scheme? I disagree. I don't think they used it pursuant to the scheme. This scheme thing was originally – it really had nothing to do with taxes. It was supposedly you somehow buy a car, you give Mr. Kennedy money. Mr. Bocking did have a car in his garage, right? He had a car in his garage. Was it an Escalade? Escalade he put 1,000 miles on in one year. And they had the other side. I mean, you know, how far he drives is up to him. But he had that. But I don't even see that the bankruptcy court even accounted for the Escalade. That is, the destinos didn't even get credit here for having bought a car that Mr. Bocking was driving and it was sitting in his garage. Your Honor, I don't think they get credit for any of these things because this was not how he intended to use the money. But I don't think you can escape liability just by saying we've accounted for the money, but even though they took the money and used it in ways he did not intend them to do that. Let me ask you to focus the limited time or some of it on the theory that I think the bankruptcy court adopted, which is that the accounting was so inconsistent and unreliable, I'm going to blame the accountant or blame the number cruncher and say you're liable for everything. Can you defend, if you accept my premise for the moment, that was the basis of the judgment you're trying to defend, can you defend that judgment? Yes. Without regard to the use of the money, I mean, assuming for the sake of argument it was used for appropriate reasons. Ms. DeSfino at trial couldn't explain what she did with the money. We have to remember this. All the money? She explains some of the money, but at trial we asked her what she did with certain money, in fact, $116,000 of personal expenses, and she acknowledged she spent the money on that. Then she produces an accounting showing it was spent on escalates.  Now, let me start with the example you used. She couldn't explain what it was for, and then she could explain what it was for. Well, by the time the court reaches a conclusion, there is evidence with regard to what it was spent for. So what's the accounting problem there? Why justify an award for that amount if, in fact, by the end of the proceedings, it was determined they were spent on these cars? Well, I think the problem with her accounting, which actually made her position impossible, is once she took Mr. Bockting's money, deposited it into her own accounts and spread it out over five or six different accounts, commingled it with her own money, all she could really put together was a list of things she spent money on. It was all commingled, so there's really no way to say this was for that or this was for that. But we know money was spent on cars. We know money was spent on groceries in her PG&E bill, but she just arbitrarily picked what she wanted. You're trying to defend a judgment of a very large amount, and at least some of that amount appears to have been expended on things that are the cars, including the car that your client had possession of. So why is it the defendant should be liable for that? Because I think certainly I wish Judge Russell had made a more detailed ruling. The way he described misappropriation, I think a lot of what he was relying upon is he did not believe that they intended to use this money for Mr. Bockting wanted his life savings invested in this manner. I think that's a lot of what he was saying. I wish he didn't. But he didn't. Unfortunately, that is at odds with the findings he actually made on the underlying legal premise. So then you're left with, well, now, what does the accounting show? And that's where it seems to me it falls short, because your argument really is predicated on this theory that this money never should have been used at all in the first place for any of this, and that's why you can come up with a big number. But unfortunately, the Bankruptcy Court didn't say that there was really fraud or that the money shouldn't have been used. He just said you have to account for it, right? Well, the judge does say there are indications of fraud. I could go either way. But he didn't. I wish he made a bit more detailed finding. I mean, I agree. He could go either way, but he only went one way, so. But the word accounting is not just a list, say, here's a list of numbers and they mathematically add up. An accounting is more than that. An accounting means that you – it mathematically adds up, and these things were used for other business purposes. The term you didn't do a good accounting is not just that the math is wrong. It can also mean that there's a misappropriation. And Judge Russell's findings should be held. You don't necessarily have to agree with him, but as long as his findings are plausible in light of the evidence, I think there's no clear error. So you don't have to agree with him, but he was fortunate to have the opportunity to listen to the witnesses and see what they have to say. And I think you should give deference to that, and, you know, I wish he did have a more detailed findings. That would have been helpful, absolutely. All right. Thank you. Thank you. Your Honor, Mr. Bochting was actually an active player in this whole venture. He stated at trial that he wanted his money invested in this scheme, and that's exactly what happened. He signed the incorporation papers of one of the corporate sole organizations, Spirit Heart, as secretary. So he was an active participant, and it is disingenuous for him to say he didn't know what was going on. He signed the loan documents. He signed the grant deeds. And this is a year after the corporate sole venture started. So he was an active participant. There was a tax issue because he had done a 1031 exchange of two properties. And because of that 1031 exchange, he couldn't take any money out without paying capital gains tax on it. Well, Kennedy showed him that if he put his properties in this religious spirit sole corporation, that because it was a religious corporation, he could take the money out without paying taxes. And, in fact, to this day, Bochting did, in fact, take $100,000 out of the properties after they were refinanced, and he gambled it. That's considered boot. If the IRS knew right now, they'd have a legal claim against Bochting because he did not pay capital gains tax on that $100,000. The Otto v. Niles case is instructive because that was a situation where a realtor, Niles, was managing property for Dr. Otto. And Niles was accused also of defalcation because she could not account for $103,000 going into trial. During trial, the bankruptcy court actually scrutinized the record sufficiently to find that all but about $20,000 had been accounted for. So part of the job of the trial court is to determine what money is accounted for because that is the basis of a defalcation claim. And similar to Otto v. Niles, actually dissimilar, Bochting came in with a claim of $288,000 that was unaccounted for. My client, in her attempt to be honest, showed that, no, actually she got $388,000 from Bochting and then proceeded to try to explain where that went. It was the job of the bankruptcy court to scrutinize the accounting sufficient to say, yeah, the car was accounted for, certainly, as you mentioned, the one that Bochting had in his garage. In addition, two years of Bochting lived in two of the homes with his girlfriend and family for two years, and the mortgage proceeds were used to pay that. Now, my client, with a judgment, is being held liable for that. So, in effect, he lived two years free in those homes. Mr. Colvin mentioned several times that Ms. Desvino admitted spending a lot of money on things unrelated to corporate soul. And the distinction is, if you go through the trial transcript, because he had all of her records, he pulled up an invoice that said, or a statement that said she spent $1,160 to Lowe's Flooring, and that disbursement came out of the joint account. However, there's also a $2,000 credit on that same statement that came from Ms. Desvino's account. There were many other expenses that Mr. Bochting brought up that are not related to corporate soul. So he had all of her bank records. He knows that she spent money on plastic surgery and that she bought jewelry and what her grocery bill was. He had all of those records. So at trial, rather than focusing on, okay, these are the expenses that are associated with corporate soul, he chose to divert the bankruptcy court's attention successfully to these expenses that Ms. Desvino said, yeah, I spent that on a grand piano for my business. I spent that for house repairs. And I don't remember what account it came out of. And that's why there's the account. You've exceeded your time. You may want to wrap up now. I'm sorry? I said you've exceeded your time. Thank you, Your Honors. Thank you. Thank you both for your argument this morning. The case of Desvino v. Bochting is submitted.
judges: McKeown, Clifton, Bybee